UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MINA HOWARD,

Plaintiff,

v.

KILOLO KIJAKAZI, acting Commissioner of Social Security,

Defendant.

No. 1:21-cv-00340-GSA

**OPINION & ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY**

**(Doc. 17, 20)**

## I. Introduction

Plaintiff Mina Howard ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is before the Court on the parties' briefs which were submitted without oral argument to the United States Magistrate Judge.[1] Docs. 17, 20, 21. After reviewing the record the Court finds that substantial evidence and applicable law do not support the ALJ's decision.

## II. Factual and Procedural Background[2]

On February 28, 2018 Plaintiff applied for disability insurance benefits alleging disability as of March 18, 2016. The application was denied initially on October 29, 2018 and on reconsideration on January 17, 2019. A hearing was held before an Administrative Law Judge (the "ALJ") on May 7, 2020. AR 40–63. On July 6, 2020 the ALJ issued an unfavorable decision. AR 16–39. The Appeals Council denied review on September 21, 2020. AR 5–10. On March 5, 2021 Plaintiff filed a complaint in this Court.

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge. *See* Docs. 8 and 9.

[2] The Court has reviewed the relevant portions of the administrative record including the medical, opinion and testimonial evidence about which the parties are well informed, which will not be exhaustively summarized. Relevant portions will be referenced in the course of the analysis below when relevant to the parties' arguments.

**III. The Disability Standard**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted). If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate non-disability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.
>
> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the

claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f). While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience. *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

## IV. The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity between her alleged disability onset date of March 18, 2016 and her date last insured of December 31, 2018. AR 22. At step two the ALJ found that Plaintiff had the following severe impairments: rheumatoid arthritis, multiple sites; systemic lupus erythematosus (SLE); and, left knee degenerative joint disease status post total knee arthroplasty. AR 22. The ALJ also found at step two that Plaintiff had the following non-severe impairments: diabetes mellitus type two; mild thoracic spondylosis; hypertension; mood disorder; and, soft tissue masses. AR 22–25. At step three the ALJ found that Plaintiff did not have an impairment, or combination thereof, that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 25.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform less than the full range of sedentary work as defined in 20 C.F.R. 404.1567(a) with the following restrictions: occasionally climb ramps or stairs but otherwise never climb; occasionally perform postural activities; occasionally use foot controls; occasionally handle and finger. AR 26–31.

At step four the ALJ found that Plaintiff could perform her past relevant work as a case

administration (court clerk) as generally performed. AR 32. Accordingly, the ALJ found that Plaintiff was not disabled at any time between her alleged disability onset date of March 18, 2016 through her date last insured of December 31, 2018. AR 32.

**V. Issues Presented**

Plaintiff asserts two claims of error: 1) the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's subjective testimony; 2) the ALJ failed to consider Plaintiff's eligibility for a closed period of disability; and 3) the ALJ failed to resolve a conflict in the vocational evidence concerning Plaintiff's past work as a court clerk.

**A. Plaintiff's Subjective Testimony**

**1. Applicable Law**

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are

reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). The RFC need not mirror a particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence. *See* 20 C.F.R. §§ 404.1545(a)(3).

The ALJ is responsible for determining credibility,[3] resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p. An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82. If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons. *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p

[3] Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities." S.S.R. 16-3p at 1-2.

at *10. Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record. S.S.R. 16-3p at 5.

**2. <u>Analysis</u>**

The ALJ found there were medically determinable impairments which could reasonably be expected to cause the alleged symptoms. AR 29. The ALJ found no malingering. As such, the ALJ was required to identify clear and convincing reasons for rejecting Plaintiff's symptom allegations.

The ALJ summarized Plaintiff's allegations as follows:

> The claimant alleged disability due to fibromyalgia, carpal tunnel syndrome, systemic lupus erythematosus, diabetes, rheumatoid arthritis, pain in her left knee, a tumor on her right arm, anxiety and stress. She complained of difficulty using her hands, including difficulty manipulating buttons. She reported decreased memory and concentration. She reported constant falls and the need for the use of assistive devices such as a wheelchair, cane of walker. She complained of a need for assistance to perform all daily activities (Exhibits 2E; 6E; 12E; 17f; 18F; Hearing testimony).

The ALJ rejected the testimony for the following reasons:

> Overall, the claimant's allegations of disability prior to her date last insured are not entirely consistent with the medical evidence of record. Although the claimant has received consistent and regular treatment for her lupus and rheumatoid arthritis, treatment records reflect she generally responded well to medication. While the record does reflect more flares of symptoms in the latter part of 2018, physical examination showed she retained generally normal motor strength with some reduction to four out of five motor strength in her lower extremities. Treatment records reflect she underwent a successful left knee arthroplasty with a total reduction of left knee pain and by December 2017 she ambulated without the use of

> an assistive device. Treatment records also reflected she retained normal sensation in her bilateral feet throughout the applicable period with normal reflexes and generally normal range of motion in all extremities. She did exhibit inflammation of her hands and feet, particularly towards the end of 2018 with some limited range of motion during symptom flares. However, examinations consistently noted normal muscle tone. Further, the record does not reflect balance deficits or frequent falls as the claimant alleged. Moreover, apart from her left knee and successful arthroplasty, the treatment record does not reflect escalating treatment modalities, such as increased frequency of treatment, physical therapy, assistive device usage, pain management, recurrent emergency room visits, inpatient hospitalizations, or surgery to alleviate the claimant's alleged symptoms, which suggests the claimant's symptoms were not as severe as alleged or that the conservative she received was relatively effective at controlling her symptoms. The record reflects no use of assistive devices after December 2017 through the end of the applicable period. The record does not reflect reports of difficulty performing her activities of daily living during the applicable period.
>
> AR 29.

As a general matter, Defendant disputes Plaintiff's approach to her first claim of error. As Defendant emphasizes, the RFC is not the most one can do while remaining symptom free; it is the most one can do despite one's limitations. As Defendant further emphasizes, it is not as if the ALJ rejected the existence of severe impairments causing significant limitation or assessed a demanding RFC. To the contrary, the ALJ assessed about as restrictive an RFC as possible: a reduced range of sedentary work with occasional postural activities and occasional handling and fingering.

Nevertheless, in contrast to other cases cited by Defendant, this is not a case where the Plaintiff offered undifferentiated complaints of generalized pain and limitation. Rather, she offered fairly specific testimony about the nature and extent of her limitations with respect to use of her hand joints, walking, assistive device requirements, frequent falls, and reliance on daughters for most personal care (AR 47-55). This testimony, if accepted, would reasonably establish that she cannot meet even the modest demands of the reduced range of sedentary work with up to two hours of standing and walking and an equal amount of postural activity, handling, and fingering, particularly without any accommodation for the use of an assistive device.

Turning to the ALJ's articulated reasoning, Plaintiff first disputes the ALJ's finding that "[a]though the claimant has received consistent and regular treatment for her lupus and rheumatoid arthritis, treatment records reflect she generally responded well to medication." AR 29. "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for benefits." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1035, 1039 (9th Cir. 2008).

There are no corresponding findings in the ALJ's summary of medical evidence (or in the medical evidence itself) that suggest Plaintiff's lupus or rheumatoid arthritis (RA) were generally well controlled by medication. The ALJ acknowledged "more flares of symptoms in the latter part of 2018." AR 28. The "latter part of 2018" is a vague reference, but in any case the relevant period under review here is relatively short such that symptom flares during a discrete period spanning half a year undermines the ALJ's conclusion that she "generally responded well to medication."

Further, the ALJ noted "more flares" in the latter part of 2018, tacitly acknowledging there were other flares earlier in the relevant period, just not as many flares. Indeed, notwithstanding Plaintiff's medication and injection regimen the record reflects objective and subjective documentation of flares throughout the relevant period, not just "the latter part of 2018." These included: 1) in June 2016 Dr. Fung notes "[m]uch more active disease." (AR 336-37); 2) in July 2016 Plaintiff reports injections not controlling rheumatoid arthritis symptoms (AR 34); 3) in August 2016 Dr. Fund prescribes alternative medication (AR 331); 4) in November 2016 Plaintiff reports that the switch from Remicade every 8 weeks to Actemra every 4 weeks helped but symptoms remain severe (AR 328); 5) in February 2017 her diagnosis is described as "uncontrolled rheumatoid arthritis" (AR 442); 6) in November 2017 she undergoes total left knee replacement due to rheumatic changes; 7) in February 2018 methotrexate immunosuppressant was added due to an ongoing flare with elevated sedimentation rate (AR 653); 8) in May 2018 increased synovitis

and chronic deformity of hand joints is noted (AR 650); and, 9) in November 2018 Dr. Leyba notes "unable to see any good response with Remicade" and switches to Embrel injections (AR 702).

In short, Plaintiff's RA was treated with an extensive medication and injection regimen, the frequency, dosage, and type of which was frequently in flux. The RA condition was overtly described as "uncontrolled" by Plaintiff herself and by her medical providers. The ALJ was not correct in finding the condition "generally well controlled by medication."

In response, Defendant emphasizes the ALJ's finding that Plaintiff routinely had normal strength, range and ambulation. Resp. at 11, Doc. 20 (citing AR 26-29; 555, 557, 558, 604, 648, 649, 650, 655, 702). Plaintiff cites counter examples largely contained in the records cited above. Despite each party mostly relying only on the records which support their view, both parties tacitly acknowledge (as did the ALJ) that the record at a minimum contained mixed findings in those respects. If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).

Relatedly, Plaintiff disputes the ALJ's findings as to normal muscle tone and reflexes, considerations Plaintiff contends reflect the ALJ's misunderstanding about the nature of rheumatoid arthritis, which is an autoimmune condition affecting the joints, not muscles or reflexes. Perhaps that is a true statement with respect to reflexes, but not necessarily as to muscle tone, bulk, or strength. Although RA does not attack muscle tissue directly, if the joint symptoms were as debilitating as Plaintiff contends (and her activity was as limited as alleged), one might expect to see disuse atrophy or weakness in the muscle groups controlling the affected joints, yet the record does not strongly support muscle loss despite some isolated findings of minor weakness (4 out of 5) in her lower extremities. Ex. 12F/6-8. It's not clear if the ALJ drew that inference about normal muscle bulk and strength being indicative of activity level, or if the ALJ was indiscriminately citing

normal findings as the ALJ appeared to do by emphasizing normal reflexes and sensation in Plaintiff's feet despite no allegation of any abnormalities in those respects.

Third, Plaintiff disputes the ALJ's finding that:

> Apart from her left knee and successful arthroplasty, the treatment record does not reflect escalating treatment modalities, such as increased frequency of treatment, physical therapy, assistive device usage, pain management, recurrent emergency room visits, inpatient hospitalizations, or surgery to alleviate the claimant's alleged symptoms, which suggests the claimant's symptoms were not as severe as alleged or that the conservative she received was relatively effective at controlling her symptoms.

AR 29.

It is true that only one of Plaintiff's affected joints (her left knee) degenerated to the point that it required replacement surgery. It is also true that the record does not reflect recurrent emergency room visits or inpatient hospitalizations. It is debatable however that long term degenerative joint disease (even of disabling severity) would necessitate acute emergency care or inpatient hospital stays (at least outside of the surgical context), much less recurrent ER visits and inpatient hospital stays. Thus, those observations are somewhat duplicative of the ALJ's observation about the lack of surgery, which itself was an assertion that required a disclaimer given Plaintiff did indeed have two left knee surgeries including a repair and a total knee replacement.

The remaining observations were not persuasive as to the lack of "escalating treatment modalities, such as increased frequency of treatment, physical therapy, assistive device usage, pain management." As to the lack of increased frequency of treatment, the point is unclear. The 1,000 page record reflects numerous treatment visits throughout the relevant period. The ALJ did not attempt to calculate the number of treatment visits overall, or during any discrete period of time to substantiate such an assertion, nor would doing so be a fruitful exercise.

Plaintiff contends the record does reflect escalating treatment given her infusions were switched from a regimen of Remicade every eight weeks to Actemra every four weeks. AR 328–

29. Perhaps Actemra is simply indicated for use every four weeks whereas Remicade is indicated for use every 8 weeks. In any case, the ALJ's point was not persuasive because frequency of treatment does not necessarily speak to the aggressiveness of the treatment.

Further, it is not clear based on the ALJ's above-quoted assertion whether the word "increased" was intended only to modify "frequency of treatment," or if it was also intended to modify "physical therapy, assistive device usage, [and] pain management." But Plaintiff did indeed undergo physical therapy (AR 341, 345-347, 365-367), and she did use various assistive devices at various times. The ALJ did acknowledge the assistive device use but drew a distinction between her ambulation before knee replacement surgery (which involved assistive devices) and her ambulation thereafter, which did not. AR 28. Plaintiff does not dispute that dichotomy. As discussed in more detail below, the lack of assistive device usage was a valid point for the ALJ to raise in the context of her successful knee replacement surgery and justifies the ALJ's exclusion of an assistive device requirement from the RFC for *part* of the relevant period. But it does not excuse the exclusion of such a limitation for the entire relevant period, nor is it a persuasive observation to raise in an attempt to establish that her overall care for all joints affected by RA was "conservative."

Finally, as to the alleged lack of pain management (or lack of "increased" pain management), the ALJ's point is not clear. In a general sense Plaintiff's extensive medication and injection regimen was at least partially to alleviate pain, even if the primary goal was protection of joint tissue by dampening the systemic auto-immune response, as opposed to targeting a specific site of inflammation (such as via local steroid injections), or reducing Plaintiff's subjective perception of the pain (such as with opioids). It is not clear if steroid injections and opioids are the type of additional pain management measures the ALJ would consider non-conservative in this case, or if such measures are indicated for the treatment of RA symptoms. Further,

immunosuppressants are not exactly risk free as they leave the patient vulnerable to infection disease, and in Plaintiff's case allegedly resulted in significant hair loss. AR 27.

In sum, as to the aggressiveness of Plaintiff's treatment regimen, at best the record establishes that the only joint requiring surgical intervention was her left knee, after which she ambulated without assistive devices. With respect to her other joints, it appears she availed herself of many of the treatment measures available to her short of surgery, yet it is not clear what else she could have pursued.

Fourth, Plaintiff contends "The ALJ's Assertion That Plaintiff Did Not Have Falls Is Factually Incorrect." Br. at 31. But the ALJ's actual assertion was that she did not have frequent falls as she alleged, which is not necessarily inaccurate. AR 29. Plaintiff contends the record establishes at least two falls relevant to the period under review, one in August 2015 and one in January 2016. Both falls predate the period under review which started March 2016. Even assuming these two falls are relevant to the period under review (as they only predated the same by a few months), two is not necessarily frequent.

She also cites Dr. Leyba's notation in February 2017 (AR 497) that she "has a tendency to fall" due to knee valgus deformity. Dr. Leyba does not have personal knowledge of her alleged falls. Thus, his notation does not necessarily establish a tendency to fall. Rather, Dr. Leyba appeared to be suggesting her self-reported tendency to fall is credible in his view given her knee valgus deformity.

Finally, Plaintiff did not discuss the opinion evidence. Defendant contends the opinion evidence supported the ALJ's RFC, specifically the prior administrative medical findings of the State agency medical consultants who likewise concluded Plaintiff retained the capacity for a range of sedentary exertional level work. While that is accurate, it is somewhat of a truism. The prior administrative findings at the initial and reconsideration levels (which largely incorporate the

medical consultant's opinions) were by definition unfavorable, or the case would not have reached the ALJ hearing level. Where the ALJ's decision is also unfavorable, the RFC tends to overlap to a large extent (if not directly mirror) the prior RFC of the agency medical consultants.

The opinion of the consultative examiner (Dr. Stoltz), by contrast, did not support the ALJ's RFC but identified work preclusive limitations in most respects, though the ALJ rejected that opinion because: 1) it post-dated the end of the relevant period by one year (demarcated by Plaintiff's date last insured of December 31, 2018); and, 2) the opinion followed Plaintiff's stroke which could explain many of her limitations thereafter. AR 30. Plaintiff does not contest this finding. In sum, the opinion evidence as a whole does not substantially support or undermine the ALJ's RFC.

On balance, the ALJ's articulated reasoning for rejecting claimant's testimony, and in support of the RFC more generally, was at least partially sufficient (and largely uncontested) as to Plaintiff's successful left knee replacement surgery on November 20, 2017, including the following observations: 1) full weight bearing by December 7, 2017 with healed wounds, mild swelling, mild tenderness (Exhibit 7F/14); 2) assistive device use during recovery but not after December 2017 (Exhibit 7F/12); 3) as of her last physical therapy appointment on December 22, 2017 she exhibited a mild antalgic gait without the use of an assistive device with fair strength (Exhibit 19F/4); 4) In January 2018, the claimant reported no post-operative pain with full weight bearing (Exhibit 7F/15); 5) In February 2018, the claimant reported continued pain in her left knee (Exhibit 8F/12), but ambulated without the use of assistive devices (Exhibit 9F/7); 6) by March 2018, the claimant reported full weight bearing with no pain and no use of assistive devices (Exhibit 7F/18); 7) treatment records in May 2018 noted she continued to ambulate without the use of a walker (Exhibit 9F/5); 8) Examination in August 2018 showed she was ambulating quite well (Exhibit 9F/3); and,

9) in November 2018, the claimant reported no pain in her left knee with normal strength in her upper extremities albeit four of five in her lower extremities (Exhibit 12F/7).

As to Plaintiff's other joints, the ALJ's discussion was not particularly persuasive, including the assertion that her RA was well controlled by medication, that her treatment was conservative, and that she did not require escalating modalities such as physical therapy and pain management. As summarized above, the record demonstrated fairly consistent RA flares throughout her joints despite multiple medication and injection regimen alterations, associated inflammation, swelling, and range of motion deficits particularly in her wrists. *See, e.g.*, Ex. 9F/11 (reduced ROM in wrists); 9F/8 (range deficits and synovitis of wrists, metacarpals and finger joints); 9F/5 (swelling, stiffness of hands and wrists); 12F/6-8 (two plus synovitis in wrists and one plus in other joints).

The ALJ's discussion simultaneously covered the evidence related to her left knee (which admittedly recovered quite well) with the evidence related to her systemic joint issues that did not require surgery but still required significant treatment, treatment which was not entirely effective. She was often seen for all joint issues, so for efficiencies sake the ALJ's approach was understandable. But there is no suggestion that her other joints recovered as well as her knee, and some additional independent reflection on those other joints (particularly wrists and hands) is warranted. Without opining whether that would be an independent basis for remand, because the case warrants remand on other grounds as discussed below, the Court will also instruct the ALJ to reconsider the testimonial, diagnostic, and examination evidence regarding Plaintiff's other joints besides her left knee, and reach a reasoned and specific conclusion whether any changes to the RFC are necessary.

**B. <u>Consideration of a Closed Period of Disability</u>**

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Ninth Circuit has recently emphasized the importance of considering how a claimant's symptoms change over time. *See, Smith v. Kijakazi*, 14 F.4th 1108, 1116 (9th Cir. 2021) (finding the ALJ "erred by seeking only to reach a single disability determination for the entire multi-year period, thereby failing to consider whether Smith was disabled for only a qualifying, early portion of that time.").

Here, the relevant period under review was fairly short, spanning about two and a half years between Plaintiff's alleged disability onset date of March 18, 2016 and her date last insured of December 31, 2018. AR 22. Despite the ALJ's finding that Plaintiff was not disabled at any point during that period of time, Plaintiff contends the ALJ should have given additional consideration to whether she was disabled during a discrete 12 month period within that two and a half year relevant period.

Specifically, Plaintiff makes this argument in the context of her use of assistive devices which the ALJ correctly noted were not required as of December 2017 following her knee replacement surgery recovery, and were not required from that point until the end of the period under review one year later. As Plaintiff emphasizes, however, this still leaves about 21 months between her alleged onset date of March 18, 2016 (the date of her first knee surgery, a meniscectomy) through the date of her November 2018 knee replacement surgery. The ALJ did acknowledge the use of assistive devices during that time period including canes, crutches, and wheelchairs (AR 26-29). Plaintiff also provides a detailed overview of each such occasion (the accuracy and sufficiency of which Defendant does not dispute) including: 1) crutches in February 2016 (AR 364-365) and April 2016 (AR 341, 345- 347); 2) wheelchair in June, August and October 2016 (AR 329, 331, 337); 3) crutches again in February, April and July 2017 (AR 450, 493, 496, 498); and, 4) walker and wheelchair while recovering from the total knee replacement surgery in

November 2017 (AR 554, 555). This appears to establish at least continuous assistive device use of at least 12 months, though not all of it establishes assistive device necessity as some of the above cited records are simply observations that she used such a device.

In response, Defendant does not contend otherwise but nevertheless concludes that Plaintiff failed to "establish disability due to difficulty with ambulation by the date on which she was required to", namely December 31, 2018. Resp. at 15-16. The one page counterargument is unclear, but Defendant appears to be suggesting one or both of the following: 1) Plaintiff needed to be disabled as of the last day of the relevant period ("by December 31, 2018"); and/or, 2) that ambulation difficulties do not in and of themselves establish disability.

The first argument is not a correct statement of law and renders the above-cited *Smith* decision a nullity along with the doctrine of a closed period of disability. *See Smith*, 14 F.4th at 1116 (9th Cir. 2021). If there was a continuous period of 12 months within the relevant period where the claimant was disabled, she'd be entitled to benefits during those 12 months irrespective of her eligibility for the entire relevant period or thereafter.

The second argument is imprecise. The disability determination hinges on a variety of findings within the 5-step sequential process, and Defendant identifies no basis to conclude that assistive device use would not impact that determination. If Plaintiff required assistive device use for a continuous 12 month period, that restriction needs to be incorporated into the RFC (likely two RFCs would need to be articulated, which is not uncommonly done: one version of the RFC for the period when an assistive device was required, and another for the remainder of the relevant period). Finally, the revised RFC would need to be posed to the VE to determine whether it impacts her past relevant work or other work in the national economy.

Notably, despite not including the assistive device limitation in the RFC, the ALJ did nevertheless pose it to the VE in an alternative hypothetical and the VE testified that even

wheelchair use would not preclude claimant's past relevant work as a court clerk because court buildings are wheelchair accessible. AR 60. This suggests the error was harmless, however Defendant did not raise this as a defense and Plaintiff thus had no occasion to brief the issue and explain why the error is still harmful in her view.

### C. Vocational Evidence Concerning Past Work as a Court Clerk

Pursuant to SSR 00-4p:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

The ALJ restricted Plaintiff to occasional handling and fingering (up to 1/3 of an 8 hour day) in consideration of her problems with her hand joints. According to the DOT, Plaintiff's past work as a court clerk only requires occasional handling and fingering, which is consistent with the RFC and the ALJ's finding at step four that Plaintiff could perform her past work as a court clerk. DICOT 243.362-010 (G.P.O.), 1991 WL 672263.

At the hearing the VE unremarkably explained the DOT's requirements for the job, namely occasional handling and fingering. Thereafter, Plaintiff's counsel questioned the accuracy of the DOT's description of the handling and fingering requirements. Counsel asked the VE, "is it your experience that they [court clerks] do only need occasional handling, fingering, and feeling, or do you believe it would rise or could rise to frequent handling, fingering, and feeling?" (AR 60). The vocational expert replied, "[i]t would be my opinion that it would be at frequent for handling and

fingering." (AR 60, 61). Neither the ALJ nor counsel asked further follow up questions. In the ALJ's written decision that ALJ simply rejected the VE's testimony in that respect because it was expressly contradicted by the DOT. AR 32.

For reasons that are not entirely clear, Defendant contends there was no error here. Defendant appears to be arguing one or both of the following: 1) that there was no conflict between the DOT and the *RFC*; and/or, 2) that SSR 00-4P concerns situations where the ALJ relies, without explanation, on the *VE's* testimony at the expense of DOT, but not conversely.

Neither argument is valid. The conflict at issue in SSR 00-4P is a conflict between the DOT and the VE's testimony, not a conflict between the DOT and the RFC. Defendant cites one unpublished opinion to support the theory, but it is otherwise absent from the caselaw and is unsupported by the explicit text of SSR 00-4P which indicates the conflict of importance is between the DOT and the VE's testimony.

Second, it is admittedly much more common that the VE offers testimony which is unfavorable to a claimant, and the ALJ impermissibly relies on that testimony *at the expense of the DOT* which contains information more favorable to the claimant, thus resulting in a claim of error on appeal. And, although Defendant does not tether her argument in any way to the text of SSR 00-4P, some of that text does suggest it doesn't apply to the inverse situation. Specifically, it states "When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict *before relying on the VE or VS evidence* to support a determination or decision about whether the claimant is disabled." (emphasis added).

This italicized text perhaps suggests that reliance on the VE over the DOT is prohibited, but not conversely. Two sentences later, however, SSR 00-4P states "Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict." If the conflict did not need to be

explored when the ALJ was choosing the DOT's answer over the VEs (but only required exploration in the inverse situation), then that would mean the DOT automatically trumps in that scenario. But again, SSR 00-4P explicitly states that neither one automatically trumps. Thus, the conflict must be explored in either scenario.

Here, the DOT classified Plaintiff's past work as a court clerk as requiring only occasional handling and fingering (1/3 of the day), whereas in the VE's experience it actually requires frequent handling and fingering (2/3 of the day). The job description tends to support the VE's view:

> Performs clerical duties in court of law: Prepares docket or calendar of cases to be called, using typewriter. Examines legal documents submitted to court for adherence to law or court procedures, prepares case folders, and posts, files, or routes documents. Explains procedures or forms to parties in case. Secures information for judges, and contacts witnesses, attorneys, and litigants to obtain information for court, and instructs parties when to appear in court. Notifies district attorney's office of cases prosecuted by district attorney. Administers oath to witnesses. Records minutes of court proceedings, using stenotype machine or shorthand, and transcribes testimony, using typewriter. Records case disposition, court orders, and arrangement for payment of court fees. Collects court fees or fines and records amounts collected.

*Id.* That description appears to contain many handling and fingering activities. In any case, SSR 00-4P required the ALJ to inquire further about the conflict and reach a reasoned conclusion why the DOT's answer was chosen over the VEs answer, not to summarily reject the latter.

**VI. <u>Conclusion and Remand For Further Proceedings</u>**

Remand is appropriate for the ALJ to: 1) give more specific consideration to the evidence regarding the impact of RA on Plaintiff's other joints besides just her left knee (which was successfully repaired) and any associated limitations; 2) whether the evidence establishes a closed period of assistive device <u>necessity</u> lasting 12 months during the relevant period; 3) to inquire of a VE (to the extent possible, the same VE) as to the handling and fingering requirements of the court clerk position as generally performed and whether the DOT is mistaken in stating the requirement is only occasional; and 4) to proceed through the sequential process as necessary.

## VII. Order

For the reasons stated above, the Court finds that substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled. Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is granted. The Clerk of Court is directed to enter judgment in favor of Plaintiff Mina Howard and against Defendant Kilolo Kijakazi, acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **March 31, 2023**

**/s/ Gary S. Austin**
UNITED STATES MAGISTRATE JUDGE